FILED
U.S. DISTRICT COURT
IN THE UNITED STATES DISTRICT COURT OF MARYLAND
FOR THE DISTRICT OF MARYLAND

2002 DEC 13 P 3:32

CLERK'S OFFICE
AT BALTIMORE

| | | |
|---|---|---|
| **WAYNE B. EWELL** | : | |
| | : | |
| v. | : | CIVIL NO: L-00-3720 \_\_\_DEPUTY |
| | : | |
| **VENTIV HEALTH U.S. SALES INC., et al.** | : | |

## MEMORANDUM

Plaintiff Wayne B. Ewell filed this employment discrimination suit against his former employer, Ventiv Health U.S. Sales, Inc. ("Ventiv"). The complaint alleges one count of age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. After discovery, Ventiv filed a Motion for Summary Judgment, which was fully briefed by both sides. On December 4th, the Court held a hearing on the motion. For the following reasons, the Court will, by separate Order, GRANT Defendant's Motion for Summary Judgment and CLOSE the case.

**I.   Background**

In May 1998, Mr. Ewell became an independent contractor for MDD, Inc. ("MDD"), a company which provided sales and marketing services to pharmaceutical companies. MDD was acquired by Snyder Communications, Inc. ("Snyder") in November 1998. In March 1999, Snyder hired most, but not all, of MDD's independent contractors as Snyder employees. Through that transition, Mr. Ewell, then 58 years old, was hired by Snyder. In September 1999, Snyder was renamed Ventiv Health U.S. Sales, Inc. Throughout his employment at Ventiv, Mr. Ewell worked on the Eli Lilly contract.[1]

---

[1] All further references to Snyder Communications or Ventiv Health U.S. Sales will be to Ventiv.



Ventiv is not a sales organization, in that its marketing representatives do not sell drugs directly to doctors. Instead, the representatives teach physicians about different drugs and offer free samples. As part of his duties, Mr. Ewell visited healthcare practitioners who were licensed to receive pharmaceutical drugs and were selected by Eli Lilly for calls. During a visit, Mr. Ewell "detailed" the target practitioner, meaning that he explained the benefits, indications and contraindications of certain pharmaceutical drugs manufactured by Eli Lilly and, upon request, left samples of the drugs with the physicians.

It was important to Ventiv, as demonstrated by the company's written policies and protocols, that marketing representatives meet face-to-face with doctors to explain the benefits of the drugs and to leave samples. Because the marketing representatives were not selling drugs directly to the doctor, there were no sales records from which to gauge the representative's performance. To verify that the marketing representatives, like Mr. Ewell, actually met with the target doctors, Ventiv required the representatives to obtain the physician's signature on a "call card" memorializing each visit.

This policy was in accordance with that of the Prescription Drug Marketing Act ("PDMA") which requires physicians to sign a written request each time they obtain drug samples. Although it was assumed that samples would be left in the majority of visits, Ventiv required its representatives to obtain signatures for <u>each</u> visit, whether samples were left or not. (See Ex. 9.)[2] Moreover, Ventiv's written policies required that the person who signed the call card must be the licensed practitioner identified on the call document. (See Ex. 7.) To ensure

---

[2]Ventiv realized that some doctors would be less willing to sign a call card when no samples were left. Ventiv, therefore, created a narrow exception which allowed a marketing representative to get credit for up to five percent of his monthly calls by returning an <u>unsigned</u> call card, provided that the call did not involve the delivery of drug samples.

the accuracy of the signatures, Ventiv employed a system in which it sent certain call cards, selected randomly (or for cause), to practitioners' offices for signature verification.

In mid-1999, Chris Arzt, Ventiv's Director of the Analysis and Reporting Department,[3] reported to Mary McLaine, Plaintiff's Regional Director, that Plaintiff had recently been distributing a large percentage of his samples to only a few practitioners on his call plan.[4] The concern was that Mr. Ewell was not distributing his Eli Lilly drug samples to a large enough base of the target practitioners identified by Eli Lilly. (McLaine Dep. at 13-15.) Mr. Arzt suggested that a signature audit be conducted to investigate Mr. Ewell's recent job performance and Ms. McLaine agreed.

Mr. Ewell failed the signature audit. The physician's signature on eight out of fifteen audit responses were forgeries, meaning that the physician denied that the signature was his. Based on that finding, Mr. Ewell was terminated effective August 30, 1999.[5]

After exhausting his administrative remedies, on November 8, 2000, Plaintiff filed the instant case, which was removed to federal court on December 21, 2000. Plaintiff alleges that he was fired so that Ventiv could hire younger marketing representatives. He claims that Eli Lilly wanted representatives, preferably women, with a more youthful appearance and attitude. He further contends that the signature audit was conducted to create a pretext to fire him. Mr. Ewell

---

[3] It was Arzt's responsibility to analyze the activities of marketing representatives on all calls, including the number and types of samples left on those calls.

[4] Out of 200 calls over a two month period, Ewell left samples during only four calls.

[5] Since Mr. Ewell's termination, Ventiv contends it has learned that Mr. Ewell was also (i) violating company policies regarding inventory by "dumping" drug samples and "creating" drugs and (ii) violating the PDMA by leaving drug samples without obtaining the required signatures. Ventiv is not relying on those alleged violations to support its case because the company was unaware of them at the time of Mr. Ewell's termination.

argues that other, younger employees were doing the same thing he was doing, but they were not subject to signature audits. Finally, Mr. Ewell contends that, during 1999, five of the seven representatives in the Baltimore district, who were over the age of 50, were terminated and replaced by employees under the age of 45.

## II.   Summary Judgment Standard

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial). Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987).

## III.  Analysis

The familiar burden-shifting standard that the Supreme Court set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to Mr. Ewell's ADEA claim: if the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions; if the defendant provides such a reason, the plaintiff must then demonstrate that the proffered reason is a pretext. See Gillins v. Berkeley Electric Cooperative, Inc., 148 F.3d 413 (4th Cir. 1998). Although the burden of

production shifts, the plaintiff retains the burden of persuasion throughout all the stages of proof. See Burns v. AAF-McQuay, Inc., 96 F.3d 728, 731 (4th Cir. 1996).

To establish a prima facie case, an ADEA plaintiff must show that (i) he is a member of a protected class; (ii) he was qualified for his position and met his employer's legitimate expectations; (iii) he was discharged without regard to his qualifications and performance; and (iv) following discharge, he was replaced by someone outside the protected class with comparable qualifications. See Causey v. Balog, 162 F.3d 795, 802 (4th Cir. 1998).

Ewell had failed to establish a prima facie case of age discrimination. He has not demonstrated that he was meeting his employer's legitimate expectations. Ventiv's policy required that marketing representatives receive a signature from the target physician on every call the representative made. Mr. Ewell failed to do this. Not only did he fail to get the required signature, but he turned in call cards with false signatures. This violation of Ventiv policy is a justifiable reason for Ventiv to have fired Mr. Ewell, thus negating Mr. Ewell's prima facie case.[6]

Assuming *arguendo* that Mr. Ewell did meet his prima facie burden, his claim still fails because he has produced insufficient evidence to establish that Defendant's legitimate nondiscriminatory reason for Mr. Ewell's termination, i.e., his unsatisfactory signature audit, is pretextual.

---

[6]Furthermore, the Fourth Circuit has stated that in cases where the hirer and the firer are the same individual and the termination of the employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer. Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991). The record in the instant case is silent as to whether the same person hired and fired Mr. Ewell. Nevertheless, he was hired in March, 1999, at the age of 58, and then terminated six months later in August. If Ventiv had a policy against employing older male marketing representatives, it is unlikely that he would have been hired in the first place. See id. (holding that "it hardly makes sense to hire workers from a group one dislikes ... only to fire them once they are on the job.").

Plaintiff's pretext argument is essentially as follows:

(i) Eli Lilly wanted younger representatives marketing its products;

(ii) he was selected to receive an audit because Ventiv wanted an excuse to fire him; and

(iii) the Baltimore district of Ventiv was terminating the majority of employees over 50 and replacing them with younger representatives.

The Court finds that Mr. Ewell has provided insufficient evidence to support any of these contentions. Each argument is addressed in turn.

### A.     Eli Lilly wanted younger representatives marketing its products

Mr. Ewell argues that Ei Lilly wanted younger, female marketing representatives calling on physicians. He offers, however, no admissible evidence to support this claim. His only evidence is inadmissible hearsay based on rumor. There is also no evidence that Eli Lilly played any role in deciding who Ventiv hired, or even knew the age or gender of Ventiv's work force. This weak allegation is not enough to raise a genuine issue as to whether Ventiv's legitimate, nondiscriminatory explanation for Mr. Ewell's termination is pretextual.

### B.     Selection for a Signature Audit

Plaintiff contends that he was selected to receive an audit because Ventiv wanted to find an excuse to terminate him. There are several reasons why this argument fails. To begin with, Mr. Ewell produces no evidence that his selection for a signature audit was based on his age. To the contrary, the evidence establishes the Mr. Ewell was selected for a signature audit because he had been distributing too large a percentage of his samples to too few of the doctors he was supposed to visit. It is not the Court's place to reevaluate the wisdom of that decision. This Court does not sit as a kind of super-personnel department weighing the prudence of employment

decisions. DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998). Moreover, the reason Mr. Ewell was chosen for an audit is not dispositive in this case. The decisive issue is how Mr. Ewell was treated after the results from his audit were returned.

To that end, Plaintiff argues that he was treated differently than other employees who were not members of his protected class. The evidence, however, does not support Mr. Ewell's contention. Five other marketing representatives were terminated for unsatisfactory signature audits, all of whom were younger than Mr. Ewell.[7] Plaintiff argues that these cases are not analogous because these representatives worked in different offices across the country and none worked on the Eli Lilly contract.[8] This is a distinction without a difference. The undisputed evidence is that Ventiv terminated employees of all ages for unsatisfactory signature audits.

Plaintiff points specifically to the case of Pat Roe as evidence that younger employees in the Baltimore district received preferential treatment. Pat Roe's case is the only case in which an employee was not terminated after receiving negative responses on an audit. Ventiv's continued employment of Roe, however, is not indicative of a pretext of discrimination. Mr. Roe, who was 42 at the time of his audit, and within the ADEA protected class, was selected for an audit randomly, not for cause. The results contained four negative responses from physicians. What makes Roe's case different is that the company failed to designate Roe's audit as unsatisfactory and failed to refer him for discipline. The evidence shows that Roe's case was mishandled in

---

[7] The marketing representatives terminated were John Anderson (46), Gerald Aust (56), Gretchen Nichelson (38), Bertin Placide (36), and Jamie Jenson (46).

[8] Mr. Ewell also argues that these are not analogous cases because, unlike Ewell's audit, all of the other cases involved the failure to get proper signatures when leaving samples. This point is not compelling because, as noted above, Ventiv made no distinction between calls when samples were left and calls when samples were not left.

that his infractions simply fell through the cracks. These facts, however, do not show discriminatory animus on the part of Ventiv toward Mr. Ewell. See Holmes v. E.spire Communications, Inc., 135 F. Supp. 2d 657, 663 (D. Md. 2001) (holding that a mistake is not evidence of pretext); see also, Cook v. CSX Transp. Corp., 988 F.2d 507 (4th Cir. 1993) (holding that, where the employer almost always disciplines all employees similarly for the same infraction, without regard to age, a single unexplained failure to similarly discipline a younger employee will not support a finding that the employer treats older employees more severely for the infraction at issue). Moreover, Roe was an older employee within the ADEA protected group. Roe is also a male, which counters Ewell's argument that the company was shedding its middle aged men in preference for young, female workers.

Accordingly, this is not evidence from which a reasonable fact finder could conclude that Ventiv's stated reason for Mr. Ewell's dismissal is a pretext.

### C.   Baltimore District Personnel Decisions

Mr. Ewell's final argument is that the turnover in the Baltimore district office was indicative of discrimination. During 1999, five of the seven employees over the age of 50 left the office[9] and seven employees were brought on, all of whom, except one, were under the age of 45.[10] Ewell claims this pattern is evidence of systemic bias against older workers. This evidence, however, proves little in the context of this case.

Ewell provides no information concerning the reasons for the departure of four of the five

---

[9] Gordon Peoples (65), Joe Cappellari (63), Ray Pond (53), Robert Viner (51), and Plaintiff Wayne Ewell (58) left. Isidro San Juan Jr. (54) and George Cole, Jr. (57) remained.

[10] Elise Selby (39), Judy Falinski (44), Lane Tyree (31), Banfield (50), Jennifer Jarvis (35), Terri Hayes (30) and Steve Goodwin (38).

employees. He does not say whether they were fired or voluntarily resigned. Mr. Ewell provides an affidavit from only one of the five departing employees, Raymond Pond. (Pl.'s Ex. 3.) The affidavit is ambiguous. Mr. Pond states that he missed a "plan of action" meeting. Ventiv did not terminate him for that, but instead required that Mr. Pond go through retraining. He refused and resigned. The company offered to reinstate him in September, 2000, but he declined. It is clear from this evidence that Mr. Pond was not terminated, but resigned and then rejected another position with Ventiv. This is hardly evidence of discrimination against older workers.

Additionally, the ages of the workers hired by Ventiv in 1999 hardly evidence a youth movement. Two of the employees were within the over-40 protected category and two were within two years of becoming members of the class. At oral argument, Plaintiff's counsel contended that Ventiv, at Eli Lilly's urging, was replacing older male workers with young female workers, who would be more appealing to the doctor-clients. Plaintiff's own demographic evidence fails to support this hypothesis.

Accordingly, no reasonable jury could conclude that this is evidence of pretext.

### IV.    Conclusion

For the above stated reasons, this Court will, by separate Order, GRANT Defendant's Motion for Summary Judgment and DIRECT the CLERK to CLOSE the CASE.

Dated this  12TH  day of December, 2002.

_____
Benson Everett Legg
United States District Judge